# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

N⁰ 11-CV-5246 (JFB)(SIL)

---

EDWARD J. FLANAGAN,

Plaintiff,

VERSUS

NORTH SHORE LONG ISLAND JEWISH HEALTH SYSTEM, HUNTINGTON HOSPITAL, KEVIN LAWLOR, AIDER AND ABETTOR, LINDA FISCHER, AIDER AND ABETTOR,

Defendants.

---

**MEMORANDUM AND ORDER**
September 30, 2014

---

JOSEPH F. BIANCO, District Judge:

Plaintiff Edward J. Flanagan ("Flanagan" or "plaintiff") brings this action against defendants North Shore Long Island Jewish Health System ("NSLIJ"), Huntington Hospital ("the Hospital"), Kevin Lawlor ("Lawlor"), and Linda Fischer ("Fischer"), asserting causes of action for sexual harassment and retaliation against the Hospital under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and against all defendants under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.* Plaintiff alleges that he was sexually harassed by Fischer, passed over for promotion in 2008 when he rebuffed Fischer's sexual advances, and discharged in August 2009 in retaliation for complaining about the sexual harassment.

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants the motion in its entirety on the federal claims, and declines to exercise supplemental jurisdiction over the state claims. First, the federal hostile work environment claim under Title VII is time-barred and, in any event, cannot survive summary judgment because there is no evidence from which a rational jury could find the extremely vague allegations of harassment involving Fischer claimed by plaintiff were sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. Second, the federal quid pro quo claim under Title VII, based upon the failure to promote plaintiff in late 2009 or the decision to terminate him in 2009, cannot survive summary judgment because there is no evidence from which a rational

jury could conclude that either of those decisions (or a reference to a possible severance package after plaintiff failed to obtain the promotion) was, as plaintiff contends, based upon a failure by plaintiff to rekindle his sexual relationship with Fischer (which had ended in 2000). Third, the federal retaliation claim under Title VII cannot survive summary judgment because plaintiff has proffered no evidence from which a rational jury could find that the legitimate, non-discriminatory reasons articulated by defendants for the termination decision—namely, plaintiff's performance and the uncontroverted evidence that numerous employees complained to management in 2009 about increasing problems with plaintiff's unprofessional tone and performance—were a pretext for retaliation. Although plaintiff disputes the accuracy of these complaints, he has proffered no evidence that places in dispute the fact that the complaints were made (including in contemporaneous emails), and there is no evidence that the decision by the President and CEO of the Hospital to terminate plaintiff based upon those complaints was a pretext for retaliation.

## I. BACKGROUND

### A. Factual Background

The Court takes the following facts from the parties' affidavits, depositions, exhibits, and Rule 56.1 Statements of Fact. The Court construes the facts in the light most favorable to the nonmoving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Although the Rule 56.1 statements contain specific citations to the record, the Court cites to the statements rather than to the underlying citations. Unless otherwise noted, where a Rule 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any contradictory evidence in the record.

### 1. The Defendants

The Hospital is located in Huntington, New York. In 2011, it joined the Obligated Group of NSLIJ, having previously had an affiliation with NSLIJ. (Def. 56.1 ¶¶ 1–2.) The Hospital has its own Board of Directors and is an independent legal entity from NSLIJ.[1] (*Id.* ¶ 3.) The Hospital has policies and procedures in place to prevent and promptly correct any claims of sexual harassment, and forbids retaliation against any individual who makes a complaint. (*Id.* ¶ 6.) Lawlor has been the President and Chief Executive Officer of the Hospital since 2005. (*Id.* ¶ 4.) Fischer, who previously was the Director of the Hospital Information Services ("HIS") Department and supervised plaintiff, is the Chief Information Officer. (*Id.* ¶¶ 5, 11.)

### 2. Flanagan's and Fischer's Relationship

Plaintiff began working in the HIS Department in April 1995, and he met Fischer shortly thereafter. (*Id.* ¶¶ 8, 10.) In 1999, Flanagan and Fischer engaged in sexual relations. (*Id.* ¶ 14.) According to Flanagan, he ended the sexual relations with Fischer in the spring of 2000. (*Id.* ¶ 17.) Thereafter, Flanagan and Fischer continued working together and socialized, including at events hosted by Fischer and her family. (*Id.* ¶¶ 18–19.) Flanagan, among others, nominated Fischer for a leadership award at the Hospital in 2006, and he testified that he never had any trouble expressing himself to Fischer. (*Id.* ¶¶ 28–29.) It is undisputed that from the end of the sexual relationship through the end of 2008, Flanagan suffered no adverse employment action, *i.e.*, no

---

[1] That NSLIJ counsel investigated plaintiff's harassment claims and the Hospital's Board of Directors reports to NSLIJ do not controvert the fact that the Hospital is a separate legal entity from NSLIJ. (*Contra* Pl. 56.1 Response ¶ 3.)

reduction in pay, loss of benefits, or loss of title. (Def. 56.1 ¶ 27; *see* Pl. 56.1 Response ¶ 27 (focusing on events at end of 2008 and in 2009).) Fischer even helped Flanagan receive a substantial raise and a promotion to Network Engineer in 2001.[2] (Def. 56.1 ¶ 27.)

After 2001, Fischer never told plaintiff she wanted to rekindle a sexual relationship. (*Id.* ¶ 31.) She never sent handwritten communications or emails to Flanagan in which she attempted to rekindle a sexual relationship, either. (*Id.* ¶ 32.) Flanagan, however, "felt" that Fischer "was always moving towards that direction to get back to that point in the relationship where he would engage in sex." (*Id.* ¶ 33.) He believes Fischer wanted to rekindle a sexual relationship after 2001 based on:

> Brushing up against people in the elevator, pushing back against me in the elevator, perhaps a look I didn't like very much that I thought was inappropriate, yelling . . . there was several occasions, perhaps in an elevator or in the office, moving around a desk that these types of contact occurred. I did not think they were necessarily of an innocent, accidental nature.

(*Id.* ¶ 34.) Although such incidents occurred after 2001, plaintiff does not remember exactly when these incidents last occurred. (*Id.* ¶ 35.) Flanagan never reported any of these instances at or around the time they allegedly occurred. (*Id.* ¶ 36.) He first reported the incidents to Lawlor on February 2, 2009. (Pl. 56.1 Response ¶ 36.)

### 3. Events Leading to Plaintiff's Termination

Flanagan believes he suffered adverse employment actions, including a failure to receive a promotion at the end of 2008 and his termination in 2009, because he would not renew his relationship with Fischer and because he complained about her behavior towards him. Defendants contend that there is absolutely no evidence to support those claims, and that there are legitimate, non-discriminatory reasons for their decisions.

#### a. Performance Evaluations

Plaintiff received "above standard" or "exceptional" ratings in several performance areas in his evaluations from 2001–2007, all of which were completed by Fischer. (*See generally* Performance Evaluations, Nardo Decl. Ex. 3.) There is no 2008 or 2009 evaluation in the record. According to Fischer, she prepared a written performance appraisal for 2008, but when she met with Flanagan to deliver the evaluation, he stated that the process was "stupid and a waste of time," signed the only copy of the evaluation, took it to make more copies, and never returned it. (Def. 56.1 Counterstatement Response ¶ 34.) Fisher testified that the 2008 performance appraisal was "similar" to the 2007 evaluation, and she could not remember anything negative indicated on the evaluation. (*Id.* ¶ 35.) No specific interpersonal "complaints" were noted in the earlier evaluations. (*Id.* ¶ 36.)

#### b. Succession Planning

In 2008, succession planning began throughout the Hospital, including in the HIS Department. (Def. 56.1 ¶ 39.) At the

---

[2] Plaintiff believes he received the raise because Fischer was involved in the decisionmaking process. (*See* Deposition of Edward Flanagan ("Flanagan Dep.") at 108–13, Fullerton Aff. Ex. 1.) Plaintiff also testified that he received the raise after he threatened to quit after thirty days because he thought he was underpaid. (*Id.* at 109.) Although Fischer advocated on plaintiff's behalf, others involved in the decisionmaking process had no knowledge of Fischer's and Flanagan's relationship. (*See* Def. 56.1 Counterstatement Response ¶ 39.)

3

time, Thomas Hoeft ("Hoeft") was the Executive Vice President of the Hospital, Michael Quartier ("Quartier") was the Vice President of Administration, and Fischer reported to Hoeft. (*Id.* ¶¶ 40, 45.) According to defendants, Hoeft, Quartier, and Fischer made the business decision—approved by Lawlor—that Flanagan was not the appropriate candidate to potentially assume the leadership of the HIS Department. (*Id.* ¶¶ 40–41.) Fischer alone did not decide that Flanagan would not be her potential successor. (Deposition of Linda Fischer ("Fischer Dep.") at 94:16–23.)[3] For instance, Quartier testified that although plaintiff had the cognitive and technical skills for a promotion, "the interpersonal [aspect] was really preventing him from being considered. In order to be a leader, you've got to have people willing to follow you and it became more and more apparent that the staff of the IT department would never follow [Flanagan]." (Deposition of Michael Quartier ("Quartier Dep.") at 87:21–88:5, Fuller Aff. Ex. 5.) Quartier explained that, even though some complaints were not reflected on Flanagan's evaluations for unknown reasons, "[i]n 2008 there were more and more complaints from [plaintiff's] coworkers and people who reported to him that he was extremely difficult, if not impossible to work for." (*Id.* at 89:2–14.)

With the approval of Hoeft, Quartier, and Lawlor, two people in the HIS Department other than Flanagan—John Kaziun ("Kaziun") and Lil McAlpin ("McAlpin")—ultimately were promoted to newly created Assistant Director positions. (Def. 56.1 ¶¶ 47–48.) In December 2008, Flanagan was advised of the decision, first privately by Fischer, and then more formally in a meeting with Fischer and Quartier. (*Id.* ¶ 49.) When Fischer met with Flanagan, she said she would understand if he did not want to stay at the Hospital, and that maybe the Hospital would be willing to offer him some type of severance package. (*Id.* ¶ 50.) Quartier and Fischer told Flanagan that, although there was no issue with his technical skills, he lacked leadership skills. (*Id.* ¶ 51.) Flanagan still was paid more than Kaziun and McAlpin, although he did not receive a $5000 raise through the promotion. (*Id.* ¶ 52; Pl. 56.1 Response ¶ 52.) He also does not disagree with the Hospital's decision to promote Kaziun and McAlpin. (Def. 56.1 ¶ 55.) He testified that he "never applied for the position of assistant director nor sought it. Therefore, I was never disappointed for Linda not reserving it for me." (Flanagan Dep. at 459:10–13.) There is no evidence that anyone but Fischer knew of her sexual relations with plaintiff.

c. Plaintiff's Initial Complaint

On February 2, 2009, two months after the meeting with Fischer and Quartier, Flanagan complained to Lawlor that he had been passed over for the promotions because of his sexual relationship with Fischer in 1999 and 2000 and in retaliation for his refusal to renew the relationship, and that Fischer had created a hostile work environment. (Def. 56.1 ¶¶ 53–54; *see* February 2 Complaint, Fullerton Aff. Ex. 11.) The denied promotion alone is not what prompted Flanagan to write to Lawlor. Instead, plaintiff stated that he complained because, among other things, he was afraid he was going to get fired and Fischer was discussing severance. (*See* Flanagan Dep. at

---

[3] Plaintiff claims Fischer denied him the promotion because he refused to rekindle the relationship and refused her sexual advances, and Fischer believed that plaintiff did not have the skills for the position. (Pl. 56.1 Response ¶ 40.) According to Fisher, Hoeft told her she could choose anyone but plaintiff to be her potential successor. (Def. 56.1 Counterstatement Response ¶ 42.) As discussed in more detail *infra*, plaintiff's speculation as to Fischer's motives, standing alone, cannot create a genuine issue of material fact as to the denied promotion.

4

352:19–24.) Flanagan also believes that, by December 2008, the Hospital had decided to either terminate him or force him out. (Def. 56.1 ¶ 59.) On February 6, 2009, Lawlor and Quartier met with Flanagan to hear his allegations in detail and discuss how his claim would be investigated. (*Id.* ¶ 60.) Flanagan stated that he did not want Quartier to conduct the investigation. (*Id.* ¶ 64.) Quartier arranged for Kim Green, Deputy Chief Corporate Compliance Officer of NSLIJ, to conduct an independent investigation. (*Id.* ¶ 65.)

During the investigation, Flanagan reported to someone other than Fischer. (*Id.* ¶ 66.) Green interviewed Flanagan, Fischer, and six other employees, and reviewed numerous documents. (*Id.* ¶ 67.) She concluded that there was no credible evidence to support Flanagan's claims of sexual harassment, hostile work environment, or retaliation. (*Id.* ¶ 70; *see* Green Report, Fullerton Aff. Ex. 13.) According to Green, others described Flanagan's declining performance and inability to get along with colleagues, and several, such as Stephen Smith ("Smith") and Catherine Polcari ("Polcari"), reported being deeply adversely affected by his behavior. (Def. 56.1 ¶ 68.) No one corroborated Flanagan's allegations of sexual harassment.[4] (*Id.* ¶ 69.)

Although the Hospital was aware that Flanagan had occasional issues with some coworkers before December 2008,[5] which informed the decision not to promote him, the evidence indicates that problems became more extensive after December 2008. Employees, including Fischer, believe that after the announcement of the promotions, Flanagan became increasingly non-responsive to legitimate work requests, combative, and disruptive to the HIS Department and other departments in the Hospital. (*Id.* ¶ 73.) He also was frequently absent or unavailable. (*Id.* ¶ 74.) For instance, McAlpin stated that, although she did not have personal problems with Flanagan, "he could cause people to blow up, or reduce them to tears," and she "remember[s] always being on edge in his presence, because you never knew when he was going to say something insulting." (Declaration of Linda McAlpin ("McAlpin Decl.") ¶¶ 4–5.) David Lombardi, who also worked in the HIS Department, stated that Flanagan's "conduct created a lot of unnecessary stress for me and the rest of the employees in the HIS Department," especially after 2008. (Declaration of David Lombardi ("Lombardi Decl.") ¶¶ 4–6.)[6]

---

[4] Lawlor testified that he did not say some of the statements attributed to him by Green. (*See* Deposition of Kevin Lawlor ("Lawlor Dep.") at 116–26, Nardo Decl. Ex. 5.) Plaintiff, thus, claims that there are issues of fact because the interview notes are inaccurate and Fischer admitted to having a sexual relationship. (Pl. 56.1 Response ¶ 69.) However, as discussed *infra*, it is uncontroverted that numerous employees complained (including in contemporaneous emails) to management about plaintiff's increasingly unprofessional conduct and performance issues in late 2008 and 2009. Thus, even assuming *arguendo* that there were some inaccuracies in the report, a rational jury could not conclude that Green falsified complaints to cover allegations of sexual harassment. Moreover, the fact that Fischer admitted to having a sexual relationship with Flanagan that ended in 2001 does not, in itself, show harassment in 2008 or 2009, and certainly does not undermine the complaints that management received about Flanagan in that timeframe that ultimately led to his termination.

[5] For instance, Polcari and Smith complained to Fischer in 2007 and 2008, respectively, regarding their treatment by Flanagan. (*See* Green Report Exs. D, F (emails from Smith and Polcari).) There is no evidence that Flanagan was formally disciplined in response to these emails. Flanagan and Fischer, however, discussed Flanagan's refusal to work cooperatively with Smith in July 2008. (*See* July 2008 Audio Recording, Fullerton Reply Aff. Ex. 36.)

[6] Although plaintiff acknowledges that employees had issues with him, he speculates that the complaints

On May 14, 2009, Quartier gave Flanagan performance counseling for unavailability, tardiness, and lack of courtesy. (Def. 56.1 ¶ 74; *see* Quartier Memorandum, Fullerton Aff. Ex. 15.) Plaintiff claims the counseling was unnecessary because he did not punch a timecard, had no established time to report to work, and had been evaluated as "exceptional" for punctuality. (Pl. 56.1 Response ¶ 75.) On June 11, 2009, Quartier issued a written warning to Flanagan related to his inadequate level of responsiveness for the Intellitec I.D. Badge System Project. (Def. 56.1 ¶ 76.)

### d. The July 17, 2009 Meeting

On July 17, 2009, Fischer, Quartier, Hoeft, and Kaziun prepared a formal written disciplinary warning for Flanagan. (*Id.* ¶ 77.) The warning sets forth four specific examples of projects on which Flanagan's performance had failed to meet expectations. (*Id.* ¶ 78.)

That same day, a HIS Department staff meeting was held, with sixteen members of the Department present. (*Id.* ¶ 79.) The meeting ended after an exchange between Fischer and Flanagan regarding a project. (*Id.* ¶ 80.) Two employees at that meeting, Polcari and Lombardi, went to see Quartier to ask him to do something about Flanagan. (*Id.* ¶ 81.) Polcari testified that Flanagan had become very defensive about projects that had been on the agenda for months that were not complete, that Flanagan and Fischer engaged in a back-and-forth before Fischer ended the meeting, and that Flanagan "was completely out of line" during the meeting and "looked like he lost it." (Deposition of Catherine Polcari ("Polcari Dep.") at 41–44, Fullerton Aff. Ex. 6.) On July 20, 2009, Lombardi wrote to Lawlor to complain about Flanagan's conduct, stating that he had been aggressive to all staff present and especially Fischer. (Letter to Lawlor, Declaration of David Lombardi ("Lombardi Decl.") Ex. B.) Stephen Smith, who was not at the meeting but saw Fischer crying in her office afterward, also spoke with Lawlor. (Declaration of Stephen Smith ("Smith Decl.") ¶ 14.) Other employees sent emails and written statements to Kaziun, Flanagan's supervisor, about Flanagan's behavior, and they reported that he was causing tension within the HIS Department. (Def. 56.1 ¶ 83.) Kaziun also prepared a statement expressing his view that Flanagan had behaved inappropriately and insubordinately at the meeting. (*Id.* ¶ 85; *see* Declaration of John Kaziun ("Kaziun Decl.") ¶¶ 7–10.)[7]

---

were manufactured and points to his earlier favorable performance reviews. (*See* Pl. 56.1 Response ¶¶ 6, 72–73.) Plaintiff has failed to create a genuine dispute of material fact on this issue. *See, e.g.*, *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."). The earlier performance reviews are not probative of plaintiff's conduct after 2008. He also does not contend that the numerous employees who complained about him harbored any discriminatory animus, and there can be no claim that management fabricated these complaints, especially because there were numerous contemporaneous emails by these employees documenting their complaints (as well as declarations submitted with the summary judgment motion). Those complaints are discussed in more detail *infra*, in connection with the Court's legal analysis. In short, other than sheer speculation, plaintiff offers no evidence that management fabricated any of the complaints.

[7] Plaintiff claims that the substance of these complaints is in dispute, pointing to Polcari's testimony that Flanagan did not speak for twenty-five minutes and that the recording of the meeting played for her during her deposition sounded milder than she remembered. (Pl. 56.1 Response ¶ 81.) Leonid Frid ("Frid") testified that Flanagan spoke for approximately five minutes and did not try to provoke Fischer. (*Id.*) The Court concludes that plaintiff's contentions do not raise any genuine dispute of material fact as to the relevant issues. First, as discussed *infra*, the Court has listened to the actual

On July 19, 2009, two days after the meeting, Flanagan reported to Lawlor that Fischer acted inappropriately at the meeting and asked him to intervene, and Lawlor agreed to investigate. (Def. 56.1 ¶ 86; *see* July 19 Emails, Fullerton Aff. Ex. 22.) Plaintiff claims he reported the discrimination and humiliation because he was being punished at the meeting without reason and that he acted appropriately. (Pl. 56.1 Response ¶ 86.)

Lawlor conducted a preliminary investigation, spoke to some employees, and reviewed emails from them regarding Flanagan's conduct. (Def. 56.1 ¶ 87.) He then suspended Flanagan pending further investigation.[8] (*Id.* ¶ 88.) Lawlor and Quartier met with Flanagan on Tuesday, July 21, 2009, informed him of his suspension, and gave him the Notice of Disciplinary Action that had been prepared the previous Friday. (*Id.* ¶ 89.) Lawlor then proceeded to interview other employees who had been at the meeting. (*Id.* ¶ 90.) They reported that Flanagan's behavior had made them uncomfortable, and that he had acted inappropriately both at the July 17 meeting and at other times. (*Id.* ¶ 91; *see* Lawlor Dep. at 66–82 (detailing notes from investigation).) None of the employees believed Fischer was at fault. (Def. 56.1 ¶ 92.) Lawlor concluded that Flanagan's behavior since the succession planning announcement was disruptive and could not be permitted to continue. (Def. 56.1 ¶ 93.) Lawlor testified that he terminated Flanagan as a result of the investigation and Flanagan's performance over the previous months, the fact that the HIS Department was falling apart, and the danger that Fischer could leave the Hospital. (Lawlor Dep. at 152.) Fischer was not involved in the decision to terminate Flanagan's employment. (Def. 56.1 ¶ 95.) On August 14, 2009, Lawlor notified Flanagan of his discharge. (*Id.* ¶ 96.) Flanagan was replaced by another member of the HIS Department, Ian Farber. (*Id.* ¶ 98.)

Flanagan filed his initial charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 26, 2009. (Def. 56.1 ¶ 99.) On or about January 25, 2010, Flanagan filed a second charge alleging retaliation for filing the initial charge. (*Id.* ¶ 100.)

---

recording, and no rational juror could find that it supports plaintiff's contention that he behaved in a completely professional and non-confrontational manner during the meeting. Second, even if plaintiff's statements were not as long or as abusive as Polcari remembered them (once she listened to the recording), she testified that she saw Fischer in tears after the meeting; that she believes Flanagan's behavior at the end of the meeting was unprofessional and insubordinate; and that, although the tape sounds milder than her memory, "[y]ou could physically see that he was not happy, not going to cooperate, and just going to be – temper tantrum." (Polcari Dep. at 78, 88–91, Fullerton Aff. Ex. 6, Fullerton Reply Aff. Ex. 33.) Third, Frid's testimony is not probative because it is undisputed that he did not complain about Flanagan's conduct, and his impressions were based on the audio of the meeting, which was played at his deposition. (*See* Deposition of Leonid Frid ("Frid Dep.") at 9–11, 21–22, 25–26, Nardo Decl. Ex. 9, Fullerton Reply Aff. Ex. 34.) Frid also said he could not recall exactly what happened at the meeting. (*See id.* at 25–26.) Fourth, plaintiff's reliance on a statement by an attendee that Fischer was "nuts" or "crazy" is unavailing; the statement is inadmissible hearsay. (*See* Def. 56.1 Counterstatement Response ¶ 58 (objecting to statement).) Finally, and most importantly, any later characterization of the events of July 17 by plaintiff or other employees does not change the uncontroverted fact that several employees complained about plaintiff's behavior to management at the time (including in contemporaneous emails), and there is no evidence that the complaints were fabricated by management.

[8] Plaintiff claims he was suspended because of his February 2009 complaint of discrimination, EEOC charge, and complaint of retaliation based on the July 17, 2009 meeting. (Pl. 56.1 Response ¶ 88.)

B. Procedural Background

Plaintiff filed his complaint on October 27, 2011. Defendants answered on January 13, 2012. Plaintiff filed an amended complaint on March 30, 2012, and defendants answered on April 11, 2012. Plaintiff filed a second amended complaint on June 28, 2012, and defendants answered on July 12, 2012. Defendants filed their motion for summary judgment on April 30, 2013. Plaintiff opposed on October 31, 2013. Defendants replied on November 15, 2013. The Court held oral argument on January 13, 2014. The Court has fully considered the submissions of the parties.

II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.

1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

### III. DISCUSSION

Defendants argue that summary judgment should be granted on the sexual harassment claims (whether as hostile work environment claims or quid pro quo claims) because (1) the claims are time-barred; (2) the acts alleged by Flanagan, even if not time-barred, do not establish a viable claim of sexual harassment under Title VII or the NYSHRL; and (3) even if there were a viable sexual harassment claim, there is no basis to impute liability to the Hospital or NSLIJ. Defendants argue that summary judgment also should be granted on the retaliation claim because plaintiff cannot establish (1) a causal connection between any protected activity and his termination, or (2) that any protected activity was the "but for" cause of his discharge.

### A. Harassment Claim—Hostile Work Environment[9]

As a threshold matter, the Court concludes that the hostile work environment claim is untimely under federal law. An "aggrieved employee wishing to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act." *Petrosino v. Bell Atl.*, 385 F.3d 210, 219 (2d Cir. 2004); 42 U.S.C. § 2000e–5(e). Title VII "precludes recovery for *discrete* acts of discrimination . . . that occur outside the statutory time period, irrespective of whether other acts of discrimination occurred within the statutory time period." *Mark v. Brookdale Univ. Hosp.*, No. 04 Civ. 2497(JBW), 2005 WL 1521185, at *16 (E.D.N.Y. June 22, 2005) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)) (emphasis in original). This is because "'[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." *Id.* (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114). However, the Supreme Court has made clear that the statute does not "bar an employee from using the prior acts [that are untimely] as background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113. Flanagan filed his EEOC charge on May 26, 2009. (Def. 56.1 ¶ 99.) Thus, any incidents of sexual harassment predating July 30, 2008, are time-barred under Title VII.

It is undisputed that plaintiff's consensual relationship with Fischer ended in 2000. Plaintiff apparently premises his harassment claim, including his hostile work environment claim, on the fact that he "felt" that Fischer wanted to "get back to that point in the relationship where [they] would engage in sex," not any actual actions, conduct or words used by Fischer." (Def. 56.1 ¶ 33.) Flanagan admitted at his deposition, however, that he could not identify when Fischer last engaged in allegedly sexually harassing conduct. (*See id.* ¶ 35.) Further, at oral argument, when asked to address this issue, counsel for plaintiff conceded that he did not know the date of any alleged harassing conduct, such as an alleged brushing up against plaintiff in the elevator with other people (*see id.* ¶ 34). Mere conjecture and speculation are not enough, however, to defeat summary judgment. *See BellSouth Telecomms.*, 77 F.3d at 615. Accordingly, because there is no evidence, or even a specific allegation,

---

[9] In an abundance of caution, although plaintiff's counsel suggested at oral argument that the harassment claim should be analyzed more as a quid pro quo claim than a hostile work environment claim, the Court has analyzed the claim under both theories of liability and concludes, for the reasons discussed below, that the claim cannot survive summary judgment under either theory.

that any sexual harassment occurred on or after July 30, 2008, the Court grants summary judgment to defendants because the claims are time-barred.

Even assuming *arguendo* that the hostile work environment claim was not time-barred, the claim could not survive summary judgment because no rational jury could conclude that plaintiff's vague allegations of harassment were "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006) ("There are, of course, cases in which it is clear to both the trial court and the reviewing court that after assessing the frequency of the misbehavior measured in light of its seriousness, the facts cannot, as a matter of law, be the basis of a successful hostile work environment claim."). Plaintiff has simply put forth no evidence from which a rational jury could find that, after his consensual relationship with Fischer ended in 2000, he was subjected to a hostile work environment based upon his failure to rekindle a relationship with Fischer.

Accordingly, the harassment claim, based upon a hostile work environment theory, cannot survive summary judgment.

### B. Harassment Claim—Quid Pro Quo

In addition to the hostile work environment claim, plaintiff brings a quid pro quo sexual harassment claim. As the Second Circuit has explained,

> When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. If, however, a claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct. The terms quid pro quo and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility.

*Schiano*, 445 F.3d at 603–04 (internal quotations and citation omitted). Thus, "to establish a prima facie case of quid pro quo harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions, or privileges of her employment." *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994).

Plaintiff appears to be contending, as the basis for his quid pro quo sex harassment claim, that he was denied a promotion and offered a severance package by Fischer because he refused her sexual advances. (*See* Opp'n, at 10 ("When he refused to submit to her sexual advances to rekindle the relationship, he was denied a promotion and offered *severance pay* by Fischer.").) This claim cannot survive summary judgment for several reasons. First, as noted *supra*, there is absolutely no evidence from which a rational jury could find that Fischer wanted to rekindle the relationship with Flanagan after it ended in 2000, as they continued to work together for years without incident. There were no alleged sexual advances by Fischer close in time to the succession planning in 2008 or the

10

termination in 2009. In fact, there are no specific allegations of sexual advances after the consensual relationship ended in 2001. Plaintiff's vague statement that he "felt" Fischer wanted to re-kindle the relationship is insufficient to raise a genuine disputed fact on this issue. Second, in his deposition, plaintiff testified that he "never applied for the position of assistant director nor sought it. Therefore, I was never disappointed for Linda not reserving it for me." (Flanagan Dep. at 459:10–13.) Thus, given that he never applied for or sought the position, there is no basis from which a rational jury could find that he suffered a change of the terms and conditions of his employment, in connection with this failure to get the promotion, because of his purported refusal to rekindle the relationship with Fischer. Third, the decision regarding the succession planning was made, in part, by the Executive Vice President of the Hospital (Hoeft) and the Vice President of Administration (Quartier), based upon their own assessment of plaintiff's inability to assume a leadership position in the HIS Department because of his lack of interpersonal skills. There is no allegation that they harbored any discriminatory animus in connection with the promotion decision, or that their decision had anything to do with Fischer's prior relationship with plaintiff. In short, there is simply no evidence that plaintiff suffered a tangible employment action—a significant change in employment status—as a result of his "refusal to submit to a supervisor's sexual demands." *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54 (1998)).

To the extent that plaintiff seeks to base his claim on the alleged informal reference by Fischer to plaintiff's possible ability to obtain some type of severance (after he did not receive the promotion), that evidence also is also insufficient to preclude summary judgment on this claim. First, nothing happened as a result of that alleged reference to a severance package. In other words, plaintiff was not forced to take a severance, and there is no evidence the issue was ever discussed again. Thus, the alleged conversation did not alter the terms or conditions of plaintiff's employment. Second, no rational jury could find that such a brief conversation regarding severance is evidence that plaintiff's failure to be promoted was, in any way, connected with a purported refusal to rekindle a sexual relationship with Fischer.

Similarly, to the extent that plaintiff argues that the termination was quid pro quo sexual harassment, that claim also fails to survive summary judgment. As noted *infra*, there is uncontroverted evidence of multiple complaints by employees about plaintiff's unprofessional behavior, which resulted in his termination. Moreover, the President and Chief Executive Officer of the Hospital made the termination decision, not Fischer. Given these uncontroverted facts, no rational jury could find in plaintiff's favor in connection with a quid pro quo claim allegedly arising from his termination.

C. <u>Retaliation Claim</u>

1. Legal Standard

Title VII prohibits an employer from firing an employee in retaliation for having made a charge of discrimination. 42 U.S.C. § 2000e-3(a). In the absence of direct evidence of a retaliatory motive, a Title VII retaliation claim is subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Gorzynski v. JetBlue Airways Corp.*, 596

F.3d 93, 110 (2d Cir. 2010). Under this framework, a plaintiff must first set forth a *prima facie* case of retaliation by showing that (1) she engaged in a protected activity; (2) the defendant was aware of that activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See, e.g.*, *Kwan*, 737 F.3d 844; *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). If the plaintiff establishes a *prima facie* case of retaliation, then the burden shifts to the defendant-employer to provide a legitimate, non-retaliatory reason for its actions. *See, e.g.*, *Kirkland*, 760 F.3d at 225 (citing *McDonnell Douglas*, 411 U.S. at 802). The Supreme Court has explained the defendant's burden as follows:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated [or retaliated] against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [challenged action].

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981) (internal citation omitted); *see, e.g.*, *Porter v. Potter*, 366 F. App'x 195, 197 (2d Cir. 2010); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). Where the defendant articulates such a reason, "the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for . . . retaliation." *Kirkland*, 760 F.3d at 225.

Ultimately, because "Title VII retaliation claims must be proved according to traditional principles of but-for causation," the plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013); *see, e.g.*, *Kirkland*, 760 F.3d at 225; *Kwan*, 737 F.3d at 845. "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846. To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–101 (2003). It is insufficient, however, for a plaintiff merely to show that she satisfies "*McDonnell Douglas*'s minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, *i.e.*, whether the record contains sufficient evidence "that retaliation was a but-for cause of the adverse employment action." *Weber v. City of New York*, 973 F. Supp. 2d 227, 271 (E.D.N.Y. 2013).

### 2. Application

#### a. Prima Facie Case

Defendants argue that plaintiff cannot establish a prima facie case of retaliation based on temporal proximity because he testified that he believes the decision to terminate his employment in the summer of 2009 was made before he tendered his February 2, 2009 letter. (*See* Def. 56.1 ¶ 59.) However, the Court assumes, for purposes of the motion, that plaintiff has met the minimal burden of establishing a prima facie case and concludes, for the reasons discussed *infra*, that there is no evidence from which a rational jury could find the legitimate, non-discriminatory reasons for the termination were a pretext for retaliation.

#### b. Legitimate, Non-Discriminatory Reasons

Defendants have satisfied their burden of setting forth legitimate, nondiscriminatory reasons for their actions. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). Their proffered reasons for disciplining and terminating plaintiff are his unsatisfactory performance during his last year of employment, including his refusal to complete assigned tasks; disruptive behavior that impeded the functioning of the HIS Department; his treatment of Fischer, especially during the meeting on July 17, 2009; and other employees' complaints about his conduct. (*See, e.g.*, Def. 56.1 ¶¶ 93–94.) Accordingly, the burden shifts back to plaintiff to provide evidence from which a rational jury could find pretext.

#### c. Pretext

Plaintiff argues that defendants' reasons are pretextual because (1) they evaluated his work performance highly through 2008, and they never included criticisms regarding his attitude or conduct from individuals like Polcari, Smith, or any supervisors on these evaluations; (2) Quartier disciplined plaintiff in June 2009 for improper reasons and shortly after his EEOC complaint; (3) the Hospital concocted the complaints about the July 17, 2009 meeting, as evidenced by Frid's testimony, Polcari's retraction during the deposition, and the audio recording of the meeting itself; and (4) Lawlor terminated plaintiff in the process of investigating plaintiff's complaint about the July 17 meeting, raising an issue of fact as to whether he wanted to punish a complaining employee. (Opp'n, at 16–21.) The Court concludes that, even construing the evidence most favorably to plaintiff, no rational jury could find that plaintiff would not otherwise have been disciplined and terminated in the absence of his complaints.

Under *Nassar*, plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S.Ct. at 2533; *see also Stoler v. Inst. for Integrative Nutrition*, No. 13–CV–1275, 2013 WL 6068598, at * 12 (S.D.N.Y. Nov. 18, 2013) ("[E]ven under the 'but-for' standard articulated in *Gross* [*v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)] and adopted in *Nassar* Plaintiffs need not show that retaliation is the only cause of an adverse action. 'Instead, an employer may be held liable under [a but-for standard] if other factors contributed to its taking an adverse action, as long as [the protected characteristic] was the factor that made a difference.'" (alteration in original) (quoting *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1277–78 (10th Cir. 2010) (ADEA case))). Further, even though temporal proximity may be enough to establish a prima facie case of retaliation, it is insufficient by itself to overcome a non-discriminatory reason by demonstrating pretext. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The

temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."); *Ragusa v. Malverne Union Free Sch. Dist.*, 582 F. Supp. 2d 326, 349–50 (E.D.N.Y. 2008) (temporal proximity alone insufficient to show reasons were pretext for retaliation).

The uncontroverted evidence shows that, before Flanagan engaged in protected activity in February 2009, he was denied a promotion because of issues with his leadership and interpersonal skills. Thus, individuals at the Hospital had concerns about plaintiff's behavior and its impact on other employees even before he complained to Lawlor about Fischer. Flanagan's emphasis on his performance evaluations cannot show pretext at least for that reason. Moreover, the evaluations predate the time significant issues arose with plaintiff's performance, and neither the absence of any mention of Polcari's and Smith's complaints in a written evaluation nor the absence of the 2008 evaluation itself creates a genuine issue of disputed fact as to whether Flanagan's leadership and interpersonal skills were unsatisfactory both before and after he was told he would not become an Assistant Director. The record also reflects the seriousness with which the Hospital treated plaintiff's February 2009 complaint. Lawlor and Quartier immediately met with Flanagan to discuss his allegations, and Green conducted an independent investigation of the allegations.[10]

In addition, although plaintiff claims that Quartier improperly disciplined him in May and June 2009 for specious reasons, plaintiff fails to point to anything other than temporal proximity to indicate that Quartier actually disciplined him in retaliation for the February 2009 or EEOC complaint. Moreover, "[i]t is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008); *see also Soderberg v. Gunther Int'l, Inc.*, 124 F. App'x 30, 32 (2d Cir. 2005) ("[I]t is not the function of a fact-finder to second-guess business decisions regarding what constitutes satisfactory work performance."); *Iverson v. Verizon Commc'ns*, No. 08–CV–8873, 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009) ("Merely disagreeing with a supervisor's assessment of work performance, however, is insufficient to raise a triable issue of fact regarding pretext").

Further, Flanagan's claim that employees' complaints about Flanagan's behavior and/or the July 2009 staff meeting were "manufactured" and "fabricated" is belied by the record.[11] Nothing indicates that

---

[10] As noted *supra*, the fact that some of the quotes Green attributed to Lawlor were incorrect does not raise a genuine issue as to whether the sum and substance of her findings were inaccurate.

[11] As a threshold matter, to the extent plaintiff contends that the secret recording that he made of the July 17th meeting supports his position that any complaints about his unprofessional behavior at the meeting were without merit, the Court completely disagrees. Having carefully reviewed the recording submitted by plaintiff, it is clear to the Court that there were a number of tense exchanges during which plaintiff used what can only be characterized as an annoyed, condescending, disrespectful and/or rude tone in speaking to his supervisor, Fischer, during the meeting. Based upon both the tone and the substance of his comments to Fisher, plaintiff clearly was

the exchanges between Flanagan and Fischer, or the numerous complaints from other employees about how Flanagan generally treated them and Fischer, were manufactured or contrived, much less in a way to enable defendants to retaliate against Flanagan. For instance, plaintiff points to no evidence that Fischer or the other complaining employees knew of the EEOC charge. More importantly, it is uncontroverted that the employees complained to supervisors such as Lawlor about plaintiff's behavior (including in contemporaneous emails that memorialized their complaints), and several of the employees have submitted declarations reaffirming their recollection of the events at issue. (*See, e.g.*, Lombardi Decl. ¶¶ 4–6 ("By 2008, and for the last year or so of his employment, I generally tried to avoid dealing with Mr. Flanagan, going around him on projects to work with other members of the HIS Department whenever possible. I did this because his behavior had started to change for the worse. While previously he had been approachable, at least, he became increasingly unapproachable and disinterested; or, if I had a disagreement with him, he would insist that he was right no matter what I said to him. As a result, Mr. Flanagan's conduct created a lot of unnecessary stress for me and the rest of the employees in the HIS Department. At the end of 2008 or beginning of 2009, I learned that two new Assistant Director positions had been created in the Department and John Kaziun and Lil McAlpin had been promoted to those positions. After that, Mr. Flanagan's already difficult behavior became even worse. He was abrupt and angry. He seemed to be pouting. During staff meetings and project meetings, he would ask a lot of questions that were not really relevant; he would nit-pick issues endlessly. He seemed to be doing this just to stir the pot. Or, at other times, he just would not answer questions at all. It became uncomfortable. As a result, everyone would be on edge whenever he was around. It was a difficult environment to work in."); McAlpin Decl. ¶ 5 ("Toward the end of his employment, and especially after Mr. Kaziun and I were promoted to the new Assistant Director positions, Mr. Flanagan's

---

challenging her competency and/or authority, in front of other employees, during multiple exchanges in the meeting. (*See, e.g.*, Meeting Tr., Docket No. 59-12, at 17–18 ("MR. FLANAGAN: All right. Can you please -- I'll resend this. I'll resend this. Just edit it so that I have something clear and concise to work with. And I have very specific parameters I can use to build this."); *id.* at 18 ("MR. FLANAGAN: They shouldn't have done that. They should have talked to me or asked a little bit more information about it."); *id.* at 19 ("MR. FLANAGAN: All right. I'm going to resend this. I may add some more stuff. Do not get upset if I write back to you and say I need a little bit more clarification for what it is you're doing."); *id.* at 20 ("MR. FLANAGAN: All right. I just -- I don't understand why you just couldn't have given me something to work with in this email that we sent back in what was it, June. I'm already a month behind on this. I could have at least started with something and gotten some proposals. We've wasted already four weeks."); *id.* at 21 ("MR. FLANAGAN: All right, all right. Can we at least agree we have had no serious discussions about this? MS. FISCHER: No, I'm not agreeing to anything. I -- It's been on every time we had a staff meeting, it was brought up. MR. FLANAGAN: What? But we never discussed exactly what it is we were going to do with it. We only had this vague -- MS. FISHER: Let's move on. You're right. Let's move on."); *id.* at 42 ("MR. FLANAGAN: . . . And, you know, it's just an idea, but I don't want to spend hours working on this and then get yelled at for not working on something else unless I have the go ahead to look into it.").) No rational jury could conclude that plaintiff acted in a professional manner towards his supervisor during that meeting. In any event, even assuming *arguendo* that the recording supported plaintiff's position, it is still uncontroverted that multiple employees made contemporaneous complaints about plaintiff to management about his unprofessional behavior at the meeting (and in other contexts). There is absolutely no evidence that management had any reason to disbelieve those complaints, and no evidence that the defendant's decision to terminate plaintiff based upon those complaints was a pretext for retaliation.

behavior and performance became increasingly difficult. I remember always being on edge in his presence, because you never knew when he was going to say something insulting."); Smith Decl. ¶¶ 3, 11, 15 ("Mr. Flanagan persecuted me the whole time I worked for him. He was vindictive and carried grudges for years. He was very controlling and, as the HIS Department grew in size, increasingly showed that he could not stand the thought of things happening in the Department without his approval and control. He would try to assert his authority over projects he did not supervise, and this directly interfered with my work. He seemed determined to make life difficult for me at the Hospital. . . . Mr. Flanagan's behavior became even more obstructive in 2009, after two new Assistant Director positions were created in the Department, and John Kaziun and Lil McAlpin were promoted to them. . . . I was relieved when Mr. Flanagan's employment was terminated. Things were much better within the HIS Department after he left the Hospital – the tension was gone, and the Department worked well together as a team again."); Clayton Decl. ¶ 4 ("On Monday July 20, 2009, I sent an email to John Kaziun, Assistant Director of the Department, expressing my views about Mr. Flanagan's behavior within the HIS Department in general and during the staff meeting on July 17 2009 in particular. Among other things, I wrote that Mr. Flanagan's attitude had caused unneeded stress in the HIS Department; that I was uncomfortable talking about issues because he would become defensive; that his negative feelings toward Linda Fischer and the Hospital's Administration were clearly evident in his words and actions; and that he was detracting from the team environment we had in the HIS Department."); Theal Decl. ¶¶ 4–5 ("Mr. Flanagan's attitude was that things were 'his way, or no way.' In numerous departmental and project meetings, I witnessed Mr. Flanagan go into tirades toward other employees who, he believed, had questioned his authority by suggesting that something be done in a better or different way. He was particularly hard on Steve Smith and Mike Bizzaro, and I witnessed him treat both of those employees in a demeaning and contemptuous manner. Over the course of time, Mr. Flanagan was argumentative with numerous people in the Department, including Linda Fischer, but in the last few months of his employment, most of his animosity was targeted at Ms. Fischer. His behavior seemed irrational. It got to the point where I dreaded attending departmental meetings, wondering what Mr. Flanagan would do to make the meeting uncomfortable. Yet, whenever Mr. Flanagan would engage in disrespectful tirades against Ms. Fischer, I never saw her fight back or respond in kind."); Kaziun Decl. ¶¶ 4, 6 ("At times Mr. Flanagan was not easy to work for, but our work relationship during the years that [sic] reported to his was fine. . . . After the Assistant Director promotions were announced, Mr. Flanagan's performance and attitude changed quite a lot. His attendance deteriorated – he took more days off than he had in the past, and often left work early. He started making it more difficult to get work done in the HIS Department, often insisting on written confirmation from Ms. Fischer regarding what he was supposed to work on, and asking long lists of unnecessary questions about projects, refusing to work on them until he received answers. He became increasingly short-tempered. There were several times when he became confrontational toward Ms. Fischer, and I took him aside and tried to calm him down. On the whole, it became very unpleasant work [sic] with him.").) In sum, although plaintiff disputes the accuracy of these complaints, plaintiff does not controvert the

clear evidence that these complaints were made, and there is no evidence that these employees fabricated these complaints in retaliation for protected activity by plaintiff.

Lastly, although plaintiff attempts to show pretext because Lawlor suspended and terminated plaintiff after he complained, engaging in protected activity is not a license for an employee to stop doing his or her job, nor does it immunize that employee against termination or other adverse employment actions for unprofessional or insubordinate behavior. *See Pulley v. KPMG Consulting, Inc.*, 348 F. Supp. 2d 388, 397 (D. Md. 2004) ("The sword of an EEOC complaint cannot be used as a shield to protect an employee from the consequences of inappropriate behavior that is incontrovertibly below the reasonable expectations of his employer. This is especially the case, where as here, the conduct in question was of the same inappropriate nature both before and after the protected activity. Pulley's complaint may have been protected legally, but he was not at liberty to misbehave as a result."); *see also Brown v. Ralston Purina Co.*, 557 F.2d 570, 572 (6th Cir. 1977) ("[A]n EEOC complaint creates no right on the part of an employee to miss work, fail to perform assigned work, or leave work without notice."). In fact, Lawlor testified,

> What prompted me to suspend Ed Flanagan was the visit by Steve Smith, the visit by Linda Fischer; and, particularly, Steve Smith letting me [know] what was going on in the [department] and how this whole department was falling apart very quickly; and that Linda Fischer was very upset; we could potentially lose her. I needed to [do] what was right for the hospital . . . . What prompted th[e] decision [to turn the suspension into a termination] was the result of the investigation with all the people who were at the meeting and a series of Ed's performance over a number of months.

(Lawlor Dep. at 152.) In short, in the face of the uncontroverted evidence of the complaints by numerous employees about plaintiff in the summer of 2009, plaintiff offers no evidence from which a rational jury could instead find that Lawlor's business decision to terminate plaintiff based upon those numerous complaints (whether correct or not) was motivated by retaliatory animus arising from plaintiff's protected activity several months earlier. *See, e.g.*, *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what '*motivated* the employer . . . .'" (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)); *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) (stating that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason"); *Koleskinow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) ("Where a plaintiff has been terminated for misconduct, the question is not 'whether the employer reached a correct conclusion in attributing fault [to the plaintiff] . . . , but whether the employer made a good-faith business determination.'" (quoting *Baur v. Rosenberg, Minc, Falkoff & Wolff*, No. 07-Civ.-8835, 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008))).

For these reasons, even construing the evidence most favorably to plaintiff, no rational jury could find that defendants' decision to discipline and terminate him was

a pretext for retaliation. Accordingly, the Court grants defendants' motion for summary judgment on the federal retaliation claim. *See, e.g.*, *Kaur v. N.Y.C. Health & Hosps. Corp.*, No. 07 Civ. 6175(LAP), 2010 WL 649284, at *20 (S.D.N.Y. Feb. 19, 2010) (granting motion for summary judgment on retaliation claim where plaintiff "failed to offer evidence from which a reasonable fact-finder could conclude that her treatment by Defendant was motivated by retaliatory animus . . . [and] failed to link *any* action on behalf of Defendant to a retaliatory motivation"); *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 269–70 (E.D.N.Y. 2009) (granting motion for summary judgment on retaliation claim where plaintiff "cannot rebut defendants' legitimate, non-discriminatory reasons proffered for their actions through evidence that the reasons are pretextual, or that retaliatory animus was nevertheless a motivating factor").

### D. State Law Claims

Plaintiff also asserts claims under New York law. Having determined that the federal claims do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over plaintiff's state law claims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.*, No. 99 Civ. 3608, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state law claims given the absence of any federal claims that survive summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment as to the federal claims. The Court declines to exercise supplemental jurisdiction over the state law claims and, thus, dismisses such claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 30, 2014
      Central Islip, NY

\* \* \*

Plaintiff is represented by Raymond Nardo, 129 Third Street, Mineola, NY 11501. Defendants are represented by Traycee Ellen Klein, John Francis Fullerton, and John Houston Pope of Epstein Becker & Green, P.C., 250 Park Avenue, New York, NY 10177-1211.